132 F.3d 77

**Harriet HUNTER–BOYKIN, Appellant,**

v.

**The GEORGE WASHINGTON UNIVERSITY, Appellee.**

No. 96–7039.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1997.

Decided Jan. 9, 1998.

John P. Racin, Washington, DC, argued the cause and filed the briefs, for Appellant.

Walter A. Smith, Jr. argued the cause, for Appellee. Robert B. Cave and Mark J. Larson, Washington, DC, were on the brief. Peter W. Tredick, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, WALD and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

Concurring Opinion filed by Chief Judge EDWARDS.

GARLAND, Circuit Judge:

The summary judgment motion at issue in this case should have turned on the reasonable interpretation of the phrase "to toll the running of any statute of limitations period," as used in a letter agreement between the plaintiff and defendant. Rather than determine whether a reasonable juror could have read the phrase as the plaintiff did, however, the court below applied a set of legal rules that it thought required the phrase to be read as the defendant urged. Because we conclude that the wrong rules were applied,

and because a reasonable juror could have read the phrase as the plaintiff read it, we reverse the grant of summary judgment against her.

## I

The plaintiff in this case, Dr. Harriet Hunter–Boykin, is an African American woman whom the defendant, The George Washington University ("GW"), hired as an Assistant Professor of Secondary Education on August 2, 1990. On July 19, 1993, Hunter–Boykin's attorney wrote to GW, advising the university that she was considering suing it for racial discrimination. The letter alleged that GW had discriminated against Hunter–Boykin in her original appointment by not offering her a tenure-track, higher-paid position that it offered a white applicant at the same time. Joint Appendix ("J.A.") 73–75.

According to the parties' calculations, a three-year statute of limitations governed Hunter–Boykin's contemplated suit under 42 U.S.C. § 1981, and that period would expire on August 2, 1993, three years from the date of her original appointment. In order to provide breathing room in which to conduct settlement negotiations, the parties entered into an agreement "to toll the running of any statute of limitations period." The agreement, drafted by counsel for GW, was in the form of a letter from GW's counsel to Hunter–Boykin's counsel. Dated July 22, 1993, and signed by both attorneys, the letter stated: "This will confirm that we have agreed ... to toll the running of any statute of limitations period applicable to any purported claims ... beginning on the date of this letter through September 7, 1993." J.A. 76.

The parties agree that on the date of this letter agreement, July 22, 1993, Dr. Hunter–Boykin still had eleven days left before the statute of limitations would otherwise have run on her contemplated lawsuit. Thereafter, they entered into five additional and virtually identical letter agreements, changing only the beginning and ending dates of the time period during which the statute of limitations was "toll[ed]." The last letter was dated December 17, 1993, and continued the tolling "through January 7, 1994." J.A. 81.

On January 4, 1994, counsel for GW notified Hunter–Boykin that GW had rejected her discrimination claims. He warned that if she followed through on her threat of litigation, the University would defend its interests "with vigor." J.A. 137. Undeterred, Hunter–Boykin filed suit on January 10, 1994, three days after the end of the tolling period mentioned in the letter.

True to its word, GW did defend, and with vigor. It moved for summary judgment, asserting that the plaintiff had filed her complaint three days too late. Hunter–Boykin disagreed, arguing that to "toll" the statute of limitations means to "suspend" it. Since she had eleven days left to sue on the date the statute was first suspended, Hunter–Boykin contended that she had eleven days left to file her complaint when the last period of suspension ended on January 7, 1994. She was not late, she said; she had eight days to spare.

Defendant GW replied that, under District of Columbia law, private parties cannot agree to "suspend" the statute of limitations. A defendant can, however, agree to "waive" its right to assert a limitations defense for a discrete period. That, GW asserted, is what it did: it agreed not to assert its limitations defense if a complaint were filed during successive periods ending with the period defined in the last letter. See GW Summ. J. Reply Br. at 1, 5 (J.A. 122, 126). Moreover, GW argued, the scope of a waiver must be "absolutely clear and unequivocal." Because "the mere use of the word 'toll' plainly does not show the University's clear and *unequivocal* intent to waive its defense beyond January 7," GW asserted that Hunter–Boykin's complaint was time-barred. *Id.* at 5 (J.A. 126) (emphasis in original).

GW's motion for summary judgment was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 504. The magistrate agreed with the parties' determination of the applicable limitations period and agreed that on July 22, 1993, when the parties entered into their first tolling agreement, Hunter–Boykin had eleven days left in which to sue. Magistrate's Opinion ("Mag.

Op.") at 5–6 (J.A. 155–56). Accepting much of GW's argument, however, the magistrate concluded that Hunter–Boykin had filed three days too late, and recommended that the district court grant the university's motion for summary judgment. *Id.* at 10–11 (J.A. 160–61). The court adopted the magistrate judge's report in its entirety and dismissed Hunter–Boykin's complaint with prejudice. J.A. 201–02.

## II

■ We review the district court's grant of summary judgment *de novo. Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 150 (D.C.Cir.1996). The question to be decided on a motion for summary judgment is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In a matter involving a contract, summary judgment is appropriate where the agreement "admits of only one reasonable interpretation." *United Mine Workers of Am. 1974 Pension v. Pittston Co.,* 984 F.2d 469, 473 (D.C.Cir.1993).

In deciding this case, the magistrate judge did not ask whether Hunter–Boykin's interpretation of "toll" as meaning "suspend" was reasonable. Instead, he first applied a rule that, "[i]n the absence of a specific tolling statute, disputing parties cannot by mutual agreement interrupt or suspend the running of a statute of limitations." Mag. Op. at 6 (J.A. 156). As there is no specific provision in the District of Columbia Code "that authorizes the parties to an action to suspend or defer the running of the statute of limitations," the magistrate held that "[s]uch an interpretation is contrary to the District of Columbia statute and should be rejected by this court." *Id.* at 7–8 (J.A. 157–58). However, although he determined that parties could not suspend the running of the statute

of limitations, the magistrate agreed with GW that a defendant could "waive" its right to assert an affirmative defense. He therefore interpreted the agreement as a "waiver"—the only interpretation he regarded as lawful. *Id.* at 8 (J.A. 158).

Second, in interpreting the scope of the waiver, the magistrate again did not ask what a reasonable juror could find. Instead, he held that because the waiver stated a specific time period, he was "not prepared to enlarge that period absent persuasive evidence that defendant intended a date different from the date stated." *Id.* Finding such "persuasive evidence" lacking, the magistrate judge concluded that GW had waived its statute of limitations defense only until January 7, 1994. *Id.*

Because the magistrate's view of what the letter agreement meant clearly was colored by the two legal lenses he thought he was bound to employ, we consider the validity of those legal rules first. We then turn to the reasonable meaning of the agreement itself.

## III

■ The first legal rule applied below—that in the absence of a specific *authorizing* statute, private parties *cannot* suspend the running of the statute of limitations—turns the usual rule of construction on its head. The usual rule is that "in the absence of a controlling statute *to the contrary,* the parties to a ... potential lawsuit *may,* by agreement, modify a statutory period of limitation." 54 C.J.S. *Limitations of Actions* § 25, at 56 (1987) (emphasis added).[1] The usual rule is quite sensible, since a limitations defense is merely a "personal privilege," of which a party may choose not to avail itself. *See Atchison & Keller, Inc. v. Taylor,* 51 A.2d 297, 297 (D.C.Mun.App.1947); *see also Feldman v. Gogos,* 628 A.2d 103, 104 (D.C. 1993). If individuals can give up considerably more important protections—including

---

**1.** In the context of an agreement to shorten a limitations period, the Supreme Court stated the rule as follows: "[I]t is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that

prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period." *Order of United Commercial Travelers v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 1365, 91 L.Ed. 1687 (1947). Here, neither party contends that the length of the period proposed by its opponent is itself unreasonable.

their Fifth Amendment rights in a criminal case—what reason could there be to deny them the ability to extend a civil statute of limitations? Indeed, this court asked itself just that question, and concluded that there was no satisfactory answer, in the course of deciding that a defendant can waive the protection of the statute of limitations in a criminal prosecution. *See United States v. Wilson,* 26 F.3d 142, 155 (D.C.Cir.1994).

Neither the magistrate, nor GW, cite any precedent from the District of Columbia for the proposition that specific statutory authority is required to permit private parties to agree to suspend a statute of limitations— and we have found none. Instead, the magistrate cited five opinions decided under the laws of other states. Four of those five did not involve the validity of private tolling agreements,[2] and the fifth is also readily distinguishable.[3]

This court, on the other hand, has interpreted an agreement between two parties as effectively extending the District of Columbia statute of limitations. In *Noel v. Baskin,* the limitations period on the payment of a note had been running for almost two years when the debtor entered into an agreement to waive the statute, "in consideration of the holders' agreeing to postpone action until after [September 2, 1935]." 131 F.2d 231, 231–32 (D.C.Cir.1942). The *Noel* court interpreted the agreement as meaning that the lender had agreed to refrain from suit until that date, and that after that date passed, the three-year "statute would begin to run [anew]." *Id.* at 232. GW asserts that *Noel* stands only for the narrow proposition that parties may agree on the date upon which an action will be deemed to accrue. But it is difficult to see the practical difference between this proposition and the "suspension"

view argued by Hunter–Boykin—except that agreeing on a new accrual date gives the plaintiff even more time to sue than would agreeing on a "suspension," because it restarts the limitations clock from zero.

Numerous other courts also have applied the usual rule that, in the absence of a legislative indication to the contrary, agreements to extend the statute of limitations are permitted without specific statutory authorization. In *Aiken v. Burnet,* for example, the Supreme Court upheld a waiver of the statute of limitations in a taxpayer suit against the Internal Revenue Service, rejecting the argument that, prior to the enactment of a specific authorizing statute, the IRS lacked authority to accept waivers: "While Section 250(d) first specified that a waiver be in writing and signed by the Commissioner, there was nothing in that section which invalidated waivers made prior to its enactment or limited the effect of such instruments on the limitations therein imposed." 282 U.S. 277, 281, 51 S.Ct. 148, 149, 75 L.Ed. 339 (1931). *See also United States v. Curtiss Aeroplane Co.,* 147 F.2d 639, 640–41 (2d Cir. 1945) (L. Hand, J.).

The defendant purports to see an important distinction between a "suspension" and a "waiver" of a statute of limitations. We do not, at least as the parties use the words in this case. Even if we were to accept (as GW argues) that the word "waiver" refers only to an agreement not to assert a limitations defense during a fixed period, any agreement to "suspend" could readily be reworded as an agreement to "waive" for the fixed period of the suspension plus whatever time remained on the limitations clock. Here, for example, instead of agreeing to "suspend" the statute of limitations until January 7, 1994, the parties could simply have agreed to "waive" it

**2.** Instead, they involved the applicability of judge-made doctrines like equitable estoppel. *See City of Bedford v. James Leffel & Co.,* 558 F.2d 216 (4th Cir.1977); *Neal v. Laclede Gas Co.,* 517 S.W.2d 716 (Mo.Ct.App.1974); *Glenn v. Morelos,* 79 Md.App. 90, 555 A.2d 1064 (Md. Ct. Spec.App.1989); *Leonard v. Eskew,* 731 S.W.2d 124 (Tex.App.1987).

**3.** *Willow Tree Investments, Inc. v. Wilhelm,* 465 N.W.2d 849 (Iowa 1991), involved an agreement to extend the maturity date of a mortgage note,

which the Iowa Supreme Court rejected solely on the ground that the agreement was not recorded as expressly required by an Iowa statute. A recent Maryland opinion, cited by GW, also does not hold that parties may not agree to suspend the statute of limitations; it merely holds that they did not do so in that case. *See Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs.,* 109 Md.App. 217, 674 A.2d 106, 123 (Md. Ct. Spec.App.1996), *aff'd on other grounds,* 346 Md. 122, 695 A.2d 153 (1997).

through January 18 (January 7 plus eleven days). We see no reason for the law to prohibit the former while permitting the latter.

■ In support of the magistrate's opinion, GW makes a further argument that the magistrate did not make: the District of Columbia Code is not simply silent on the question of private agreements to extend the statute of limitations; it affirmatively prohibits them. The provision of the code in question states:

> "*Except as otherwise specifically provided for by law,* actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues:

> . . . .

> (8) for which a limitation is not otherwise specially provided

> —3 years. . . ."

D.C.Code § 12–301 (West 1997) (emphasis added). GW argues that the italicized phrase "plainly prevents private parties from agreeing whenever they wish to literally suspend or interrupt a limitations period set by statute." GW Br. at 12.

One problem with this argument is that, if we were to read the statute as GW urges, its own position that waivers are permitted while suspensions are prohibited would be untenable. The statute mentions neither "suspensions" nor "waivers." It simply states that, except as otherwise provided by law, actions "may not be brought" after the expiration of the limitations period. Since a waiver also permits an "action to be brought" after the expiration of the limitations period, the statute provides no ground to distinguish between the two. Yet, GW insists that the waiver it says it agreed to in this case, which

it concedes would permit a suit to be brought more than three years after the cause of action accrued, is lawful.[4]

But there is no reason to read the statute as GW urges, and every reason not to do so. The most straightforward reading of the italicized phrase is that it was not intended to refer to private tolling agreements at all, but rather was intended to refer to other provisions of the D.C.Code that contain limitations periods for causes of action not listed in § 12–301—so that it is clear those provisions take precedence over the three-year "catchall" of § 12–301(8).[5] This reading also has the virtue of being the one that Congress has indicated it intended. In reporting on the proposed addition of the phrase in 1963, the Senate Judiciary Committee gave this reason for its insertion: "The exception at the beginning of this section is inserted to make it clear that a limitation for a particular type of action found in any other provision of law would take precedence over the general limitations of this section." S. REP. No. 88–743, at 71–72 (1963). *See also* D.C. CODE ENCYCL. § 12–301 (West 1966) (Revision Note). Hence, there is no reason to read the phrase as any kind of reference to private tolling agreements.

In *United States v. Insurance Co. of N. Am.* ("*INA*"), this circuit was called upon to decide a case under a federal statute of limitations quite similar to § 12–301. *See* 83 F.3d 1507 (D.C.Cir.1996). The federal statute stated that, "*except as otherwise provided by Congress,* every action for money damages brought by the United States ... founded upon any contract ... shall be barred unless the complaint is filed within six years after the right of action accrues. . . ." 28 U.S.C. § 2415(a). One day short of the six years, the parties had entered into an agreement to "toll" this statute of limitations.

---

4. *See* GW Br. at 20 n.14. GW's only response is to argue that "except as otherwise specifically provided for by law" refers to case as well as statutory law, and that although this court permitted a "waiver" of the statute of limitations in *Noel,* no District of Columbia court "specifically" has permitted a "suspension" of a statute of limitations. As noted in the preceding text, this misconstrues our opinion in *Noel.*

5. Such provisions include. D.C.Code § 36–314 (one-year period for filing workers' compensation claims); D.C.Code § 20–903 (six-month period for filing claims against estate); D.C.Code § 12–309 (six-month period for filing notice of claim for action seeking unliquidated damages against D.C. government); D.C.Code§ 1–1105 (one-year period for action to recover costs of labor and materials and ninety-day period for filing notice of claim).

Giving effect to that agreement, this court permitted the United States to file suit almost six months after the statute of limitations would otherwise have run. *See* 83 F.3d at 1509–11. We see no reason why similar effect may not be given, under § 12–301, to the agreement at issue in this case.

## IV

■ Even if District of Columbia law does permit an agreement to suspend a statute of limitations, GW argues' that another rule bars courts from giving effect to such an agreement, "unless it is demonstrated by *unequivocal* evidence." GW Br. at 20 (emphasis added). This argument appears to have swayed the magistrate judge, who said he was unprepared to read the letter agreement as Hunter–Boykin urged, "absent *persuasive* evidence." Mag. Op. at 8 (J.A. 158) (emphasis added).

These formulations, however, are similar to the one the Supreme Court rejected in *Liberty Lobby* as inappropriate for deciding a summary judgment motion in the usual civil case. "The judge must ask himself," the Court said, "not whether he thinks the evidence *unmistakably* favors one side or the other, but whether a fair-minded jury could *return a verdict for the plaintiff* on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512 (emphasis added). *Liberty Lobby* did note that the inquiry on a motion for summary judgment necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. Hence, although in the "run-of-the-mill" civil case the judge should ask "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," the test is different where the substantive evidentiary burden is higher. *Id.* For example, in a libel case where the First Amendment mandates a "clear and convinc-

ing" standard, the judge must determine whether a reasonable juror could conclude that the plaintiff has shown actual malice "with convincing clarity." *Id.* GW's implicit argument, therefore, must be that this is not a run-of-the-mill case, but rather that District of Columbia law requires a heightened burden of proof to establish a waiver of the statute of limitations: a burden of demonstrating "unequivocal" evidence.

The authority GW relies on to establish such a heightened burden is this court's own opinion in *Noel v. Baskin.* But this misreads *Noel.* The *Noel* court said that it would not read an agreement between the parties as creating an "indefinite" waiver of the statute of limitations, unless that purpose were "expressed in unequivocal terms." 131 F.2d at 232. "[I]n the absence of specific language making [the waiver] perpetual," the court said, "it should be held to operate only for a reasonable time." *Id. See also Munter v. Lankford,* 232 F.2d 373, 374 (D.C.Cir.1956) ("[I]n *Noel v. Baskin* ... this court ruled that unless a waiver of the statute ... is specifically stated to be perpetual, it should be held to operate only for a reasonable time."). Hunter–Boykin does not contend that the tolling agreement here should be construed as an "indefinite" or "perpetual" waiver. Hence, *Noel*'s standard of proof has no application to this case.[6]

## V

■ Because the magistrate judge employed two incorrect legal rules, he granted summary judgment against the plaintiff without determining that no reasonable juror could read the letter agreement as she did. Nor did GW explicitly argue for such a determination in the briefs it filed in this court or below. While asserting that the rules required the court to accept its reading as a matter of law, GW appeared to concede that

---

**6.** GW also cites the maxim that courts "will strictly enforce statutes of limitations and will narrowly construe any exceptions to the statute." GW Br. at 14 & n.5. Even if this were the law of the District, we would not regard GW's construction of the agreement as any "narrower" or "stricter" than Hunter–Boykin's construction. Moreover, as noted in the following section, Hunter–Boykin's construction is so much more

reasonable than GW's that we would hold for her even if we applied the maxim against her. The one maxim that does seem appropriate here is that "ambiguity in a contract should be resolved against the drafter," *Cole v. Burns,* 105 F.3d 1465, 1486 (D.C.Cir.1997). In this case, the drafter was GW. Hunter–Boykin, however, does not need the benefit of this or any other maxim to prevail on this appeal.

Hunter–Boykin's reading was at least "one usual and customary meaning." GW Br. at 21. *See also id.* at 10, 21, 23 & n. 22, 24.

At oral argument, however, GW took a much harder line. It argued not only that its interpretation of the letter agreement was required legally, but that no reasonable person could interpret it as plaintiff did. We find this view surprising. We expect that justices of the Supreme Court, judges of this and other courts, and the heirs and assigns of Mr. Black and other law dictionary authors, also would regard it so, since all have used the word "toll" in the same manner as Hunter–Boykin. And it is particularly appropriate in this case to look to usage by judges and law dictionaries in order to divine the meaning of "toll," since it is a term of art among lawyers, and since it was used in a letter written from one lawyer to another.

We begin with the Supreme Court. In *Chardon v. Soto,* the Court noted that "[t]his opinion uses the word 'tolling' to mean that during the relevant period, the statute of limitations ceases to run." 462 U.S. 650, 652 n. 1, 103 S.Ct. 2611, 2614 n. 1, 77 L.Ed.2d 74 (1983). It then went on to explain that " 'tolling effect' refers to the method of calculating the amount of time available to file suit after tolling has ended," and noted that there were several possible "tolling effects." One, the Court said, was that the "statute of limitations might merely be suspended; if so, the plaintiff must file within the amount of time left in the limitations period." *Id.* This, of course, is precisely the "tolling effect" for which Hunter–Boykin argues. Another, the Court said, was that the "limitations period is renewed [and] the plaintiff has the benefit of a new period as long as the original." *Id.* As we have pointed out above, this was the impact of the agreement on a new accrual date in *Noel.* And finally, *Chardon* noted, "[i]t is also possible to establish a fixed period ... during which the plaintiff may file suit, without regard to the length of the original limitations period or the amount of time left when tolling began." *Id.* This is the possibility for which GW argues. It was, however, the one possibility for which no one

argued in *Chardon. Compare id.* at 661, 103 S.Ct. at 2618–19 (court of appeals correctly applied "Puerto Rican rule that, after tolling comes to an end, the statute of limitations begins to run anew"), *with id.* at 665–66, 103 S.Ct. at 2620–21 (Rehnquist, J., dissenting) (court should have applied federal tolling rule for class actions, which provides that tolling "suspends the running of a statute of limitations").

We move next to this court. In *Detweiler v. Pena,* we described the "tolling" provision of the Soldiers' and Sailors' Civil Relief Act as "suspend[ing]" the statute of limitations during a service member's period of active service. *See* 38 F.3d 591, 593 (D.C.Cir.1994). In *United States v. Wilson,* we explained that the effect of a waiver that "tolled" the criminal statute of limitations for ninety days was to extend the statute by that amount. *See* 26 F.3d 142, 156 & n. 10 (D.C.Cir.1994). And, as noted above, in *INA* we again effectively interpreted a tolling agreement in the manner Hunter–Boykin urges here. *See* 83 F.3d at 1510. Other courts, too numerous to list, also have interpreted the word "toll" as meaning "suspend" or its equivalent. *See, e.g., Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067, 1070 (7th Cir.1978) ("Tolling, strictly speaking, is concerned ... with the circumstances in which the running of the limitations period may be suspended."); *United States v. Neill,* 952 F.Supp. 831, 833 (D.D.C. 1996) (request for foreign evidence "tolled" the statute of limitations by "suspend[ing]" it until the foreign country took action on the request); *Clark v. Milam,* 847 F.Supp. 409, 421 & n.26 (S.D. W. Va.1994) (describing "tolling agreement" as "suspending" the statute of limitations).

Black's Law Dictionary defines "toll" the same way. Although it lists two definitions, the one specifically applicable to statutes of limitations parallels Hunter–Boykin's definition: "To suspend or stop temporarily as the statute of limitations is tolled during the defendant's absence from the jurisdiction and during the plaintiff's minority." BLACK'S LAW DICTIONARY 1488 (6th ed.1990).[7] Ballen-

---

7. The other listed meaning is "to bar, defeat or take away," which GW asserts supports its view.

GW Br. at 21. This is not the definition Black's specifically uses in connection with statutes of

tine's Law Dictionary is in accord. *See* BAL-LENTINE'S LAW DICTIONARY 1282 (3d ed.1969) ("to suspend or interrupt the running of the statute of limitations").

Notwithstanding the above, GW argues that its interpretation should triumph because the agreement between the parties was not simply to "toll" the statute of limitations, but to "toll the *running of* any statute of limitations." The sixth edition of Black's Law Dictionary defines this phrase as "a metaphorical expression, by which it is meant that the time specified in the statute of limitations is considered as having *passed* and hence the action is barred." BLACK'S LAW DICTIONARY 1333 (6th ed.1990) (emphasis added) (*citing United States v. Markowitz,* 34 F.Supp. 827, 829 (N.D.Cal.1940)). Arguing that this establishes that the "running of the statute of limitations" means that the time has "passed" or "expire[d]," and is not just "passing," GW contends that we must conclude that on January 7, 1994, the statute of limitations for Hunter–Boykin's suit also had passed or expired. GW Br. at 22.

Even if we were to accept the use to which GW has put Mr. Black's definition of "running",[8] it surely is not the only reasonable definition of the term. In fact, the case cited by Black's as the source for its definition actually stands for the opposite proposition, and supports Hunter–Boykin. *See United States v. Markowitz,* 34 F.Supp. 827, 829–30 (N.D.Cal.1940) (rejecting interpretation of "running" as meaning that "the statute of limitations is considered as having passed rather than as passing," and explaining that when the "suspension" of "the running of the statutory period of limitations" is over, "the statutory period ... commences to run again"). Other courts also have defined the term in a manner wholly consistent with the interpretation offered by Hunter–Boykin. *See, e.g., United States v. Moyer,* 308

F.Supp. 754, 756 (W.D. Pa.1968) ("The term 'running' is not synonymous with 'expiration,' and will be ascribed a meaning that connotes the passing of time during which a defense ... matures."), *aff'd,* 420 F.2d 375 (3d Cir. 1970). And at one time, Black's itself defined "running" as meaning that the time was "passing," not that it had "passed." *See* BLACK'S LAW DICTIONARY 1498 (4th ed.1968). Once again, the weight of authoritative usage is on Hunter–Boykin's side.

## VI

We conclude that a reasonable juror could readily interpret the parties' tolling agreement in the manner suggested by Hunter–Boykin. Because reasonableness is the appropriate standard for summary judgment in this case, we reverse the grant of judgment against her and order reinstatement of the complaint. Since Dr. Hunter–Boykin did not herself move for summary judgment, we do not consider the question whether any reasonable juror could have interpreted the tolling agreement in the manner urged by GW, and hence do not determine whether Hunter–Boykin would be entitled to ·a grant of summary judgment in her own favor.[9]

EDWARDS, Chief Judge, concurring:

I concur in the court's reasoning and judgment, save on one point. In my view, the disputed tolling agreement has only one reasonable interpretation: it suspended the running of the statute of limitations until the closing date named in the agreement, January 7, 1994. Thus, if Hunter–Boykin moves for summary judgment on remand, it appears that she should prevail as a matter of law on this point.

---

limitation, and in any event does not suggest that Black's other definition is an unreasonable one.

8. We think the better way to interpret Black's definition is not as describing the effect of tolling a statute of limitations *while* it is running, but as describing the state of play *after* the statute of limitations has run, as in this sentence: "After the running of the statute of limitations, the action is barred." This also would reconcile

Black's definition of "running" with its definition of "toll[ing]."

9. We also do not need to reach Hunter–Boykin's additional argument that, even if the letter agreement itself does not defeat the statute of limitations, GW should be equitably estopped from raising the statutory bar.